**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CASE NO. 2:24-CR-29(1)** |
| **v.** | **JUDGE SARGUS** |
| **LORIE A. SCHAEFER** | **GOVERNMENT'S SENTENCING MEMORANDUM** |

Defendant Lorie A. Schaefer fraudulently caused the United States a loss of over $2.5 million in COVID relief funds. Even after she was charged, she violated her conditions of release to try to keep her proceeds out of the government's hands, committed additional frauds, and sold forfeitable property out from under the government. Whatever has caused Ms. Schaefer to take such a dramatic turn toward criminality at this stage of her life, her willful insistence on deceiving others poses an ongoing risk to the community. The government defers its final recommendation until the sentencing hearing, when the Court can determine, among other things, whether the government continues to be bound by its sentencing recommendations in the Plea Agreement.

## PROCEDURAL BACKGROUND

On March 7, 2024, a grand jury in this District returned an Indictment charging Ms. Schaefer with two counts of Wire Fraud, in violation of 18 U.S.C. § 1343; and one count of Money Laundering, in violation of 18 U.S.C. § 1957. (Indictment, R.19.)

After entering a plea of not guilty, Ms. Schaefer was released on conditions. (Minute Entry, R.23.) On May 9, 2024, the United States filed a motion seeking

revocation of Ms. Schaefer's pretrial release on the grounds that she was committing new offenses while on release. (Mot., R.29.) The Court held a show cause hearing on May 14, 2024, (Mins., R.32), and as a result added additional release conditions, including home detention and computer monitoring. (Order, R.31.) Soon after, Pretrial Services submitted a petition alleging new violations of Ms. Schaefer's release conditions, and the Court held a show cause hearing on June 5 and June 10, 2024. (*See* Mins., R.35; Order, R.37.) Finding multiple violations, the Court revoked Ms. Schaefer's bond. (R.37.)

On July 12, 2024, the Court granted leave for Ms. Schaefer's initial counsel to withdraw. (Order, R.41.) The parties filed a plea agreement on July 17, 2024, (R.43), and on July 24, 2024, Ms. Schaefer entered a plea of guilty to Counts 1 and 3 of the Indictment. (Mins., R.45; Order, R.50.)

On October 10, 2024, Ms. Schaefer filed two handwritten, pro se motions, seeking withdrawal of her guilty plea and new counsel. (Mots., R.61.) The next day, this time through counsel, Ms. Schaefer filed a notice withdrawing the two pro se motions. (Notice, R.62; Aff., R.62-1.) On October 15, 2024, Ms. Schaefer filed two new pro se motions, again seeking to withdraw her plea agreement, and also seeking to withdraw her "financial report" related to Probation's presentence investigation. (Mot., R.63.) The Court struck the motions from the docket in an order dated October 23, 2024. (Order, R.68.)

On October 22, 2024, counsel for Ms. Schaefer sought leave to withdraw. (Mot., R.66.) After a hearing, (Mins., R.69), the motion was granted, (Order, R.71),

and new counsel was appointed, (Order, R.73). On February 5, 2025, Ms. Schaefer's new counsel moved to withdraw, (Mot. R.82), and the motion was granted, (*see* Mins., R.88). Around the same time, Ms. Schaefer filed a pro se letter with the Court, falsely representing that she had a new pro bono attorney. (Letter, R.90.) After a contempt hearing, the Court declined to hold Ms. Schaefer in contempt for her false statements but found that she had "caused unnecessary delay." (Mins., R.100.) Present counsel was appointed soon after.

The final Presentence Investigation Report issued on May 15, 2025, and sentencing is scheduled for June 17, 2025. Ms. Schaefer's sentencing memo was filed on June 5, 2025, under seal at ECF number 135.

**OFFENSE AND RELEVANT CONDUCT**

In July 2021, individuals associated with Ohio restaurant chain The Flying Pizza contacted law enforcement to report a fraudulent PPP loan of nearly $1.9 million taken out in the name of Lorie Schaefer DBA Flying Pizza LLC. These individuals reported that years ago Ms. Schaefer had been married to one of the owners of The Flying Pizza, but in recent years, after the divorce, nobody from the restaurants had been in touch with her, and none of the restaurants received any of the PPP funds. (*See* PSR, R.120, ¶ 26.)

The ensuing federal investigation uncovered a bold and elaborate plot by Ms. Schaefer to make off with huge sums of government relief funds intended for businesses and people suffering from the COVID pandemic. In March 2021, Ms. Schaefer began by establishing her bogus Flying Pizza LLC through the Ohio

Secretary of State. (*Id.*) On May 12, 2021, Ms. Schaefer applied for a PPP in the name of her newly created Flying Pizza LLC, seeking $1,893,333. (*Id.* ¶ 28.) Except for Ms. Schaefer's name, nearly every piece of information in the application was fraudulent—no great surprise given that she didn't really run a pizza business. The business address listed on the application was her own apartment. (*Id.* ¶ 29.) The business tax identification number was made up. (*Id.* ¶ 31.) The "date of establishment" of the two-month old business was 2003. (*Id.* ¶ 29.) The most important lies, though, related to the number of employees and the business' purported finances—numbers that drove the size of the PPP disbursement. Ms. Schaefer falsely claimed 98 employees, a 2019 gross income of $16,270,000, and average monthly payroll of $749,000. (*Id.*)

To support these numbers, Ms. Schaefer fabricated several documents: an IRS Form 1040 Schedule C, a bank statement, and an IRS letter purporting to provide the business' tax identification number. The Schedule C was entirely fabricated; Ms. Schaefer did not file one in 2019. (*Id.* ¶ 31.) The fake version she included with her application mirrored the massive false income and false payroll she reported on her PPP application. The bank statement was a genuine statement from one of her accounts with heavy electronic alterations. (*Id.* ¶ 30.) For example, Ms. Schaefer converted a purchase from Wendy's for $7.69 into a "Transfer to ADP Payroll" for $210,000. (*Id.*) Finally, the IRS letter Ms. Schaefer submitted with her application was altered from a sample letter readily available by web search. Although Ms. Schaefer altered the letter's first page to include her own name and

business name, she failed to alter the entire document, so that another company's name and tax identification number remained on the last pages of the document.

Notwithstanding these mistakes, Ms. Schaefer's application was approved in the urgency of getting funds to businesses in need. On May 20, 2021, $1,893,333 went into Ms. Schaefer's bank account. (*Id.* ¶ 32.) Over the next several months, she moved the money in a complicated series of transfers among bank accounts and made several large transactions, including buying a Jeep and sending a series of wires totaling over $67,000 to an Australian interior design and residential building company. (*Id.*) Most notably, in June 2021, she used the fraud proceeds to buy a house in Westerville, Ohio for over $789,000. (*Id.*)

While spending her own fraud proceeds, Ms. Schaefer was also putting her scheme to work for codefendant LaTisha Holloway. In early June 2021, Ms. Schaefer assisted with the filing of an application in the name of Jaguar Logistics, one of Ms. Holloway's companies, seeking $980,833. (*Id.* ¶¶ 33-34.) The application bore many of the hallmarks of Ms. Schaefer's own fraudulent application: massively overstated employees, income, and payroll, all supported by fake tax and bank documents. (*Id.* ¶ 34.) After receiving the funds, Ms. Holloway wired $180,000 to Ms. Schaefer as payment for her services. (*Id.* ¶ 33.)

Even after her PPP scheme was over, Ms. Schaefer continued to engage in new frauds to extract money from the Westerville house she had purchased and to try to put the house out of the government's reach. In November 2021, about four months after buying the house with cash, Ms. Schaefer took more than $200,000 out

of the house in the form of a construction loan. In mid- to late 2022, Ms. Schaefer created a Wyoming limited liability company called Regional Investments LLC and opened a business bank account in its name. (*Id.* ¶ 59.) About a year later, in August 2023, Ms. Schaefer used a friend, Person 1, to apply for a new loan on the house. (*Id.* ¶ 60.) Although Ms. Schaefer controlled the loan process, Person 1 was the face of it, and Ms. Schaefer purported to transfer Regional Investments to Person 1 to facilitate the loan. (*Id.*) The loan application contained fraudulent statements, and the loan closed for approximately $417,500 soon after Ms. Schaefer made her initial appearance in this case. (*Id.*) Regional Investments received $42,550.05 to its bank account, which Ms. Schaefer—not Person 1—controlled. (*Id.*)

Several months later, in April 2024, Ms. Schaefer lied to a new lender to try to take more money out of the house. Notwithstanding the representations she had made in securing the prior refinance loan—i.e., that she had transferred Regional Investments to Person 1 and the house to Regional Investments—Ms. Schaefer told this lender that "[m]y business" owned the house. (*Id.* ¶ 61.) In addition, Ms. Schaefer sent the lender a bogus, electronically altered version of an appraisal of the house. (*Id.*)

Later in May 2024, Ms. Schaefer and Person 2 (the daughter of Person 1), began negotiating the sale of the Westerville house to KP Homes. Schaefer participated in some of the calls from jail. The sale was consummated in late June, and Person 2 ultimately received approximately $77,000 from the proceeds. In

recorded phone calls, Ms. Schaefer and Person 2 described using these funds to hire new counsel for Ms. Schaefer, which occurred in early July 2024. (*See id.* ¶ 97.)

**BREACH OF PLEA AGREEMENT**

The United States submits that Ms. Schaefer has breached the Plea Agreement, and therefore the United States is no longer bound by its sentencing recommendations in that agreement. (*See* Plea Agreement, R.43, ¶ 14 ("Defendant understands that in the event she violates this agreement, the USAO will be relieved of all of its obligations under this agreement and may institute any charges or sentencing recommendations that would otherwise be prohibited by this agreement . . . .").) In an abundance of caution, before advancing sentencing recommendations inconsistent with the Plea Agreement, the United States seeks a determination by the Court that Ms. Schaefer has violated the Plea Agreement and the government is relieved of its obligations.

Ms. Schaefer has violated the agreement in several ways. First, she has twice attempted to withdraw her guilty plea. In paragraph 1 of the Plea Agreement, Ms. Schaefer promised she "will not withdraw or attempt to withdraw the plea." (Plea Agreement, R.43.) On October 10, 2024, a letter from Ms. Schaefer to the Court was filed, asking, "Please withdraw[] my Plea Agreement and Guilty Plea . . . ." (Letter, R.61.) Although she briefly reconsidered, Ms. Schaefer filed a new request to withdraw or amend the plea on October 16, 2024. (*See* Letter, R.63.) By attempting to withdraw the plea, Ms. Schaefer breached the Plea Agreement.

Ms. Schaefer also violated the Plea Agreement by making false representations in that agreement regarding forfeitable property. In paragraph 9, Ms. Schaefer falsely stated that "she is the true owner of the subject Real Property [i.e., the Westerville house]." (Plea, R.43.) Ms. Schaefer knew at the time, however, that she and an accomplice had recently sold the house to KP Homes. (*See* PSR, R.120, ¶ 40.) This critical misrepresentation was a violation of the Plea Agreement.

For these reasons, the United States asks the Court to find that Ms. Schaefer violated the Plea Agreement, thereby releasing the government from its obligations under the agreement.

## GUIDELINES OBJECTIONS

Ms. Shaefer lodges five objections to the Final PSR. Because the parties' arguments on most of these objections have been filed as attachments to the PSR, (*see* Objs., R.120-1 to 120-5), the government responds in summary fashion.

### ***Objection One: Loss Amount***

The United States defers its arguments regarding loss until the sentencing hearing and the Court's determination of the status of the Plea Agreement.

### ***Objection Two: § 1040 Enhancement***

Because of the plea negotiations in this case, and the varying recommendations of the Department of Justice regarding the enhancement under § 2B1.1(b)(12) made during the negotiations, the United States joins in Ms. Schaefer's objections to the enhancement as applied in this particular case. As for

the state of the law, no federal appellate court appears to have passed on the question whether the enhancement applies to PPP loans.

***Objection Three: $1 Million Gross Receipts from Financial Institution***

Since the filing of Ms. Schaefer's sentencing memorandum, the parties have conferred and agreed that the enhancement under § 2B1.1(b)(17)(A) is properly applied, as agreed in the Plea Agreement.

***Objection Four: Leadership Enhancement***

Ms. Schaefer was the leader of the two-person conspiracy between herself and LaTisha Holloway. Ms. Schaefer developed and carried out the fraud scheme for herself and Ms. Holloway, who provided the information requested by Ms. Schaefer and paid for the criminal services. A 2-point enhancement is appropriate.

Ms. Schaefer argues that the application of this enhancement, which would in turn disqualify her for the zero-point-offender (ZPO) reduction under § 4C1.1, is "disproportionately punitive." (Memo., R.135, 855.) This misconstrues the nature of § 4C1.1, which provides a reward, not a punishment. To receive the reward, an offender must meet certain criteria, including not receiving a leadership enhancement. An offender who fails to meet the criteria is not punished—she has simply failed to earn the reward.

***Objection Five: Acceptance of Responsibility***

For nearly a year after being charged by complaint in this case, Ms. Schaefer continued to lie, defraud, and place fraud proceeds out of the government's reach. Although she entered into a plea agreement, she did so failing to come clean about

her fraudulent sale of the Westerville house, and she used proceeds from that sale to manipulate the proceedings in this case. On two occasions, she later attempted to disown that plea agreement. Separately, she made false statements to the Court about her hiring of a defense attorney. Ms. Schaefer's ongoing obstructive and fraudulent conduct demonstrate that she has not accepted responsibility, and she should not receive credit as though she had.

To argue that hers is among the "extraordinary" cases in which a defendant who commits obstruction is nevertheless entitled to acceptance of responsibility, Ms. Schaefer relies on *United States v. Harper*, 246 F.3d 520, 52 (6th Cir. 2021), which affirmed the denial of an acceptance reduction. Far from providing support, *Harper* explicitly rejects Ms. Schaefer's argument that she is entitled to acceptance simply because she signed a plea agreement: "We do not find persuasive either [defendant's] argument that his guilty plea is sufficient evidence that he accepted responsibility." *Id.* at 528. Like the defendants in *Harper*, Ms. Schaefer failed to "immediately confess[]" after her obstructive conduct. *Id.* Indeed, she has never confessed to her role in selling the Westerville house to KP Homes just days before signing the plea agreement, and she specifically lied about the ownership of the house in the plea agreement. The government learned about her role in the sale only through its own investigation.

The negative consequences of Ms. Schaefer's unrepentant conduct are significant. Instead of taking custody of the Westerville house (valued at over $800,000) and recovering proceeds for the victims in this case, the United States is

now engaged in litigation with KP Homes over entitlement to the house. Because of Ms. Schaefer's unlawful sale, either KP Homes or the United States will ultimately lose the value of the Westerville house. And yet having caused this harm from her jail cell, Ms. Schaefer offered in the plea agreement to "assist the United States in forfeiting this Real Property to the United States." She should not be rewarded for such deceptive behavior.

## KEY SENTENCING FACTORS

### *Nature and Circumstances of the Offense*

Ms. Schaefer's offense was very serious: she stole millions of dollars from the government, both for herself and as a paid service to Ms. Holloway. Her theft cynically exploited a time of national tragedy, taking advantage of relaxed fraud-prevention controls designed to get money quickly to people in need. She didn't merely bend the truth or skim a little off the top; she lied grandly, inventing dozens of fake employees to maximize her theft. She then used the proceeds not for any business, but simply for her own personal use.

As serious as the original crimes were, what makes Ms. Schaefer stand out is her post-offense conduct. When law enforcement approached her, she might have promptly taken responsibility and facilitated the sale of the Westerville house to partially repay the PPP loans, which she continues to claim "was always her intention." (PSR, R.120, § 41.) Instead, she set off on a new series of frauds to extract the value of the house for herself and her friends. Even as she signed the plea agreement in this case—which she would later seek to renegotiate when she

thought she might get a better deal—Ms. Schaefer lied about the status of the house that she had recently helped to sell. Such serious and unrepentant conduct demands a significant penalty.

To resist the conclusion that she committed a serious offense, Ms. Schaefer likens her case to those of what she calls "similarly situated" defendants in this District. (*See* Memo., R.135, 862.) On closer inspection, several of the sentences she refers to are not for similarly situated defendants, but rather for low-level coconspirators, often in smaller frauds. When we look to the lead defendants in some of these cases of comparable gravity, we see that an appropriate sentence for Ms. Schaefer is much higher than the 15 months she requests.

For example, in the *Buckner* case (1:19-cr-24), Ms. Schaefer claims a similarly situated defendant was sentenced to "1-day imprisonment." (*Id.*) To be sure, one or more codefendants in that case received light sentences. But the lead defendant was sentenced to 120 months in prison. (1:19-cr-24, Judgment, R.448.) That case involved a fraud loss of roughly $2.5 million—less than the loss caused by Ms. Schaefer. (1:19-cr-24, PSR, R.384, ¶ 95.)

Similarly, Ms. Schaefer cites the *Diane* case (2:23-cr-37), referring to defendants who received "probation, restitution, and for one defendant, 1-day imprisonment." (Memo., R.135., 861 n.1.) What she fails to note is that these defendants were all held responsible for a small part of the overall fraud scheme, in each case less than $100,000. The lead defendant, who was held responsible for an

intended loss of a little over $2 million (again less than Ms. Schaefer's), was sentenced to 72 months in prison. (2:23-cr-37, Judgment, R.188.)

One final example: Ms. Schaefer cites the *McMahan* case (2:22-cr-196), again referring to a 1-day sentence. (Memo., R.135., 861 n.1.) There, the loss amount was under $550,000, and the lead defendant, facing a guidelines range of just 24-30 months, was sentenced to 6 months in prison. (2:22-cr-196, Judgment, R.79.)

Ms. Schaefer's requested sentence appears to be pegged to the 15 months imposed on codefendant Ms. Holloway. (Judgment, R.97, 467.) This fits Ms. Schaefer's pattern of comparing herself to significantly less culpable defendants. Ms. Holloway's guideline range was much lower than Ms. Schaefer's, which reflects that she was responsible for less loss, did not obstruct justice, took responsibility for her offense, and was found to be the caretaker of a minor who would be harmed by a longer term of imprisonment. (*See* SoR, R.98.) As the far more serious offender, Ms. Schaefer should receive a far more serious sentence.

***History and Characteristics of the Defendant***

Ms. Schaefer's history and characteristics are unusual. At the time she embarked on the extravagantly fraudulent conduct of the past few years, she had a clean criminal history and was sixty years old. As she points out in her sentencing memorandum, normally, a lack of criminal history suggests that the present offense may be an aberration in an otherwise law-abiding life. And if Ms. Schaefer's conduct had ended with the PPP fraud, that might have been a fair conclusion. But rather than return to a law-abiding life, Ms. Schaefer has instead doubled down at every

turn on a commitment to fraud. Similarly, her age is a statistical signal that her career as a criminal should be sunsetting. Her conduct, however, suggests she is just getting started. In short, age and criminal history are not the mitigating factors for Ms. Schaefer that they frequently are in other cases.

Ms. Schaefer reports an extensive history of trauma and abuse. These claims are unsubstantiated, and skepticism about potentially mitigating facts is warranted when Ms. Schaefer is their sole source. Moreover, even if true, these alleged incidents took place decades ago. It is not clear that these incidents are relevant to Ms. Schaefer's fraudulent conduct in this case.

Finally, Ms. Schaefer argues that the Court should reduce her sentence because of her "pre-sentence confinement conditions," by which she means ordinary detention at the local county jail. For starters, Ms. Schaefer need not have spent any time in jail at this point. She was initially released and was living comfortably in her fraudulently obtained Westerville house. It is only because of her repeated violations of her conditions of release that she has been in jail before sentencing. (*See* PSR, R.120, ¶¶ 17-21.)

This would not of course justify inhumane conditions of confinement, but although Ms. Schaefer cites personal health issues and asserts a "lack of nutritious food" at the facility, she offers no evidence that anything about her confinement warrants the extraordinary relief she requests. The conditions she describes are a far cry from the case she cites, *United States v. Carty*, 264 F.3d 191 (2d Cir. 2001), where the defendant had been imprisoned for months in the Dominican Republic in

a dark, tiny cell with several other inmates, no running water, and "[h]is only toilet was a hole in the ground." *Id.* at 193. Even there, the appellate court didn't find these conditions warranted relief, *id.* at 197, and on remand the district court reimposed the same sentence, (1:95-cr-973 (S.D.N.Y.), Am. Judgment, R.13).

Ms. Schaefer is entitled to credit for the time she has served, but no reduction to the sentence is justified on the basis of her ordinary, self-inflicted detention.

***Need to Afford Adequate Deterrence to Criminal Conduct***

"Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013) (internal quotation marks omitted). Moreover, general deterrence is critical in the context of government fraud committed in a national emergency like the COVID-19 pandemic. Punishment is necessary to remind would-be fraudsters that an emergency is not a vacation from the rule of law.

As for Ms. Schaefer herself, she clearly needs something to get her attention and dissuade her from the path she's chosen. She claims to be "extremely unlikely to reoffend," (Memo., R.135, 859), but her only evidence is statistics from which she is an obvious outlier, having begun and sustained a criminal career in her sixties.

***Defendant's Need for Treatment***

Ms. Schaefer was recently found competent, with no significant issues raised regarding her mental health. Nevertheless, the United States supports a BOP placement to address any mental or physical health problems she may be facing.

## CONCLUSION

Ms. Schaefer committed a major fraud on the United States in a time of national emergency. When she was caught, she attempted to evade responsibility and make the most of her fraud proceeds, even as she entered into a plea agreement. A significant penalty is required.

The United States defers a specific sentencing recommendation until the sentencing hearing, when the Court can rule on whether Ms. Schaefer has breached the Plea Agreement and released the government from its obligations.

**Respectfully submitted,**

KELLY A. NORRIS
Acting United States Attorney

s/ David J. Twombly
DAVID J. TWOMBLY (OH 0092558)
DAMOUN DELAVIZ (PA 309631)
Assistant United States Attorney
303 Marconi Boulevard, Suite 200
Columbus, OH 43215
Phone No.: (614) 469-5715
Fax No.: (614) 469-5653
Email: david.twombly@usdoj.gov
damoun.delaviz@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served this 6th day of June, 2025, electronically upon counsel for the Defendant.

s/ David J. Twombly
DAVID J. TWOMBLY (0092558)
Assistant United States Attorney